**Not for Publication**

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| KEITH HASAN ASHLEY-DRAKE,<br><br>　　　　　　Plaintiff,<br><br>　　v.<br><br>RONALD L. CHARLES, *et al.*,<br><br>　　　　　　Defendants. | Civil Action No.: 25-4227 (ES) (JSA)<br><br>OPINION |

SALAS, DISTRICT JUDGE

Before the Court is the amended complaint submitted by *pro se* plaintiff Keith Hasan-Drake ("Plaintiff"), a pretrial detainee incarcerated at Essex County Correctional Facility ("ECCF"). (D.E. No. 10 ("Amended Complaint" or "Am. Compl.")). Plaintiff also has filed two motions for a temporary restraining order ("TRO"). (D.E. No. 13 ("First Motion for TRO" or "First Mot. for TRO"); D.E. No. 14 ("Second Motion for TRO" or "Second Mot. for TRO")). In addition, he has submitted a letter requesting a TRO (D.E. No. 7 ("Request for TRO" or "Req. for TRO")), several letters asking the Court to order the production of documents and recordings (D.E. No. 8 ("First Grievance Form Request"); D.E. No. 13 ("Second Grievance Form Request"); D.E. No. 14 ("Production Request"); D.E. No. 15 ("Mental Health Document Request"); D.E. No. 15-1 ("Third Grievance Form Request")); and a letter asking the Court to order local and state authorities to visit him so he could file a criminal complaint (D.E. No. 9 ("Criminal Complaint Request" or "Crim. Compl. Req.")).

The Court has granted Plaintiff's application to proceed *in forma pauperis* (D.E. No. 12), and the Amended Complaint is now subject to screening pursuant to 28 U.S.C. §§ 1915(e)(2)(B)

and 1915A(a) and 42 U.S.C. § 1997e(c) to determine whether the Court should dismiss the pleading as frivolous or malicious, for failure to state a claim upon which the Court may grant relief, or because it seeks monetary relief from a defendant who is immune from suit.

The Court concludes, with the following caveats, that dismissal of the entire matter is not warranted at this early stage of the proceeding. The Criminal Complaint Request is **DENIED** *with prejudice*, and the other motions and requests are **DENIED** *without prejudice.*

## I.    BACKGROUND

In his 107-page Amended Complaint, Plaintiff names the following defendants: (i) Ronald L. Charles, Director, ECCF; (ii) Regina Marrow, Deputy Director, ECCF; (iii) Captain Orlando Camacho; (iv) Lt. Pansini, Badge No. 2439; (v) Lt. Connell; (vi) Sgt. Ali, Badge No. 2823; (vii) Sgt. Bogan; (viii) Sgt. Maenar; (ix) Officer Muniz; (x) Officer Otera, Badge No. 3224; (xi) Officer Waters; (xii) Officer Howard, Badge No. 2929; (xiii) Kathy Coley, Secretary, ECCF; (xiv) John Doe, Badge No. 3278; and (xv) Mr. Zydzik, Detention Hearing Officer ("Defendants"). (Am. Compl. at 5–15[1]).

The gist of the Amended Complaint is that Plaintiff's constitutional rights and "Inmate's Rights & Responsibilities" were violated because all (or some) Defendants: (i) denied him court-ordered access to the law library and interfered with his right to counsel with respect to his pending criminal case; (ii) deprived him of basic procedural protections in a disciplinary proceeding; (iii) retaliated against him for attempting to exercise his rights to access to the courts and to counsel by

---

[1]    All citations to the Amended Complaint are to the page numbers automatically generated by the Court's CM/ECF Case Management System.

closing a sliding door on his head on two occasions; and (iv) used excessive force in connection

with the two sliding door incidents.

On October 11, 2024, in the state criminal action against Plaintiff pending before the

Superior Court of New Jersey, Law Division, Union County (Indictment No. 23-06-00398), the

Honorable Regina Caulfield, P.J.Cr., entered the following order:

> THIS MATTER having been opened to the court by Michael Shulman, Esq., attorney for defendant, and Assistant Prosecutor Caroline Lawlor, Esq., appearing on behalf of the State, and defendant having the right to review the voluminous discovery in this matter, and to prepare for his upcoming motions, and for good cause shown,
>
> IT IS on this 11th day of October, 2024,
>
> ORDERED that defendant be permitted to use the law library at the Essex County Correctional Facility every day, seven days a week, for at least three hours per day, until the disposition of his pending criminal case.

(Am. Compl. Ex. A ("Court Order" or "Ct. Order")).

On October 16, 2024, under Marrow's signature, a memorandum (with the subject heading

"**Extended Law Library Time**") was sent to "**Captains**," which stated the following: "Union

County inmate Keith Ashley-Drake, #23702877, housed in 2D 104 01, has been approved for

extended law library time of three (3) hours, three (3) times per week.  He is to be allowed extended

law library access from ***October 16, 2024 to November 21, 2024.***"  (Am. Compl. Ex. B ("Marrow

Memorandum" or "Marrow Mem.") at 1 (further indicating that each time Plaintiff uses the law

library should be logged and to "Check for KSF")).  The following individuals were listed as

"cc:[ed]": Charles, Lt. Camacho, Captains, Lieutenants, and Sergeants.  (*Id.*).

Plaintiff alleges that, on or about October 16, 2024, Marrow knew (or should have known)

that she was violating his constitutional rights and "Inmates Rights & Responsibilities when . . .

3

Judge Caulfield[] sent a Court Order to the [ECCF] and she disobeyed the Judge's Court Order by sending out a frivolous & malicious invalid . . . Memorandum to the staff members at [ECCF]." (Am. Compl. at 22). In particular, she allegedly violated his Fifth and Sixth Amendment rights to the United States Constitution and his "Inmate's Rights & Responsibilities" by failing to correct the Marrow Memorandum and thereby depriving him of "the Extended Law Library Time" (three hours per day until the disposition of his pending criminal case) ordered in the Court Order "so that he may prepare a defense in this case by [reviewing] the voluminous discovery [in the criminal case]." (*Id.* at 24). This deprivation in turn meant Plaintiff "was unable to prepare a defense for his case and "unable to be tried only [on] the charges found by a grand jury." (*Id.*). Plaintiff likewise alleges that his "Inmate Rights" were violated because:

> 1) He did not have the right to participate in the use of law library reference materials to assist him in resolving his legal problems; 2) Mr. Ashley-Drake did not have the right to review the voluminous discovery to prepare a defense in his criminal case; and 3) Mr. Ashley-Drake did not have a right to assist his attorney with his defense in his criminal case.

(*Id.* at 25). According to Plaintiff:

> In addition, Mr. Ashley-Drake's Inmate Responsibilities: 1) Mr. Ashley-Drake did not have the Responsibility to present honestly and fairly his petitions, questions and problems to Union County Superior Court[] . . . , being a judge's Court Order was not adhere[d] to; 2) Mr. Ashley-Drake did not have the responsibility to use the law library resources in keeping with the correctional facility procedures and schedule prescribed and to respect the rights of other inmates.

(*Id.*).

Plaintiff further alleges that he sent "multiple letters concerning the Court Order to Deputy Director Marrow, but she ha[s] so [far] ignored the letters." (*Id.* at 25–26 (alleging that copies of the letters were sent to Judge Caulfield, Shulman, Lawlor, Dunne, Dunne, & Cohen (Plaintiff's civil counsel), and then-Governor Phil Murphy)). "By Deputy Director Marrow not correcting

4

what she knows to be an invalid . . . Memorandum that she sent to the staff members at [ECCF] concerning Extended Law Library Time for Mr. Ashley Drake and for her to elicit the truth concerning the Court Order that . . . Judge Caulfield sent to [ECCF]," Plaintiff was prejudiced and was unable to prepare a defense for his case, "being that he lost a lot of time at the [ECCF's] law library due to him being unable to go to the law library [every day, seven days a week, for at least three hours per day, until the disposition of the pending criminal case]." (*Id.* at 26).

Plaintiff's allegations regarding the other named Defendants are essentially identical to his allegations against Marrow. Specifically, he claims that, *inter alia*, the other Defendants also knew or should have known that they were violating his constitutional rights and Inmate's Rights and Responsibilities when Judge Caulfield sent the Court Order to the ECCF, they disobeyed the Court Order, and their failure to intervene and correct the Marrow Memorandum resulted in, among other things, Plaintiff being unable to prepare a defense in the criminal case and to review the voluminous discovery in the criminal matter. (*See id.* at 18–103). In addition, Coley typed the Marrow Memorandum, which was addressed and sent to the "Captains" and "cced" to Charles, Lt. Camacho, "Lieutenants," and "Sergeants." (*See id.* at 19, 88). Plaintiff also "sent multiple letters concerning the Court Order to Director Charles, but he ha[s] ignored each and every letter that was sent to him." (*Id.* at 21 (further alleging that copies of the Charles letters were sent to Judge Caulfield, Shulman, Lawlor, Dunne, Dunne & Cohen, Governor Murphy, and Marrow)).

Plaintiff claims that, on July 1, 2024, he was in the dayroom in the 2D-1 unit and went to the electrical sliding door (which is controlled by officers to allow individuals to enter and exit the unit) to tell an officer that "he had a dispute with concerning the law library." (*Id.* at 84). Plaintiff had his head "sticking out of the doorway while the other part of his body was on 2D-1 unit" (and he could not remember if the door was completely or partially opened to allow him to speak with

the officer). (*Id.*). "The only thing that Mr. Ashley-Drake remember[s] is that the electrical sliding door closed so fast on Mr. Ashley-Drake's head that he actually heard his head being crushed by the electrical sliding door." (*Id.*). Plaintiff's head was stuck between the door and the wall for approximately five seconds until Officer Waters opened the door completely. (*Id.*). Plaintiff then fell to a squatting position, and another inmate helped him get back on his feet. (*Id.*). He was disoriented and went the wrong way. (*Id.* at 85).

On September 22, 2024, Plaintiff asked Officer Muniz (who was "working on the Board (the control panel)") several times to go to the law library. (*Id.* at 72). Officer Muniz ignored him until Plaintiff spoke with a supervisor during his tour of the 2D-1 unit (Sgt. Scott). (*Id.*). Sgt. Scott ordered Officer Muniz to allow Plaintiff to go to the law library. (*Id.*). The Plaintiff went to the 2D-1 unit law library from 3:45 p.m to 4:49 p.m. (*Id.*). Officer Muniz violated a court order by allowing him to go to the law library for only one hour and four minutes. (*Id.* (alleging that Officer Muniz and Sgt. Scott knew of the court order, which was posted on the unit)).

On the next day (September 23, 2024), Plaintiff went to the law library at ECCF from 7:20 a.m. to 8:00 a.m. (*Id.* at 76). Officer Otera, who was handling the control panel for the unit, told him: "That you have enough time in the law Library get your ass out." (*Id.*).

A second incident involving the unit 2D-1 sliding door occurred on October 16, 2024. Sgt. Bogan called Plaintiff over to the sliding door to talk. (*Id.* at 53). Plaintiff and Sgt. Bogan argued about the Court Order, with Plaintiff claiming that what Sgt. Bogan was doing was not right and that he was supposed to follow the Court Order. (*Id.* at 53–54). Sgt. Bogan proceeded to walk away from Plaintiff, whose head was "sticking out of the doorway." (*Id.* at 53). Sgt. Bogan then ordered Officer Otera (who was at the control panel) to close the door on Plaintiff's head, telling the officer "to close the fucking [] electrical door on Mr. Ashley-Drake's [sic]." (*Id.* at 54). Officer

Otera complied with the order and closed the door on Plaintiff's head. (*Id.*). Plaintiff fell to his knees, felt a "crushing sensation in his head, until Officer Otera opened the electrical sliding door," and he was disoriented for a period of time. (*Id.*). Plaintiff indicates that he has "a civil suit [in which he is being represented by Dunne, Dunne & Cohen] because he sustained severe injuries to his body (e.g., [he] injured his head, with constant dizziness, headaches, having psychological trauma, nightmares, with double vision, blurriness and loss [sic], ears ringing, and soreness on his head and jaw)." (*Id.* (further alleging that video and sound of the incident exists)).

As a result of this incident, Sgt. Bogan issued—and Lt. Pansini approved—a disciplinary report dated October 16, 2024, charging Plaintiff with conduct disrupting or interfering with the security or orderly functioning of the correctional facility. (Am. Compl., Ex. D ("October 16, 2024 Disciplinary Report" or "Oct. 16, 2024 Disciplinary Rep.") at 1). Sgt. Bogan alleged that Plaintiff was upset about his "extended law library time," he became irate, and the sergeant then ordered him back into the unit. (*Id.*). Plaintiff then "launched his head while the door on the unit was being closed." (*Id.*). A code was issued, and a team was assembled to deal with the situation. (*Id.*).

Plaintiff indicates that Zydzik sanctioned Plaintiff based on the October 16, 2024 Disciplinary Report, ordering him to serve six (6) days in detention and thirty (30) days of loss of tablet privileges. (Am. Compl. at 33, 100). As a result of these sanctions, he was unable to go to the law library or use LexisNexis on his tablet and could not prepare his defense in his criminal case. (*Id.* at 100–01).

Lt. Pansini authorized the October 16, 2026 Disciplinary Report although he knew or should have known that a Court Order was in place that permitted Plaintiff to use the law library, Plaintiff was prejudiced and unable to prepare a defense for his case because he lost a lot of time

at the law library due to being unable to use it daily for at least three hours a day, Lt. Pansini failed to tell staff members that Plaintiff "has a Court Order," and Lt. Pansini failed to make sure that Plaintiff received the proper time in the law library while in detention.  (*Id.* at 32–33).

On October 16, 2024, Plaintiff was placed on suicide watch (although Dr. Metilllus from the medical department documented that he did not need to be placed on this watch).  (*Id.* at 106). On the same date, he also went on a hunger strike because he was in detention and could not go to the law library.  (*Id.* at 107).

In addition, Sgt. Bogan told Plaintiff that "he [Sgt. Bogan] would go to the Administration at [ECCF] to make sure that this Court Order be voided, so he made [a] promise on his word to only come back to 2D-1 with the [Marrow] Memorandum which he showed to the staff members and stated [to] them, 'That this better be followed.'"  (*Id.* at 52).  Sgt. Bogan gave Plaintiff a copy of the Marrow Memorandum (which made Plaintiff "distraught").  (*Id.*).  He also gave staff members and Plaintiff a copy of a document entitled "**Law Library Scheule**" and instructed staff to follow it.  (*Id.* at 52–53).  The schedule, signed and dated by Sgt. Bogan on October 22, 2024, stated the following:

> **Hours**
>
> **Sunday 12:00 –1500**
>
> **Tuesday 1200 – 1500**
>
> **Thursday 1200 – 1500**
>
> **This schedule is to be followed until further notice and documented**

(Am. Compl., Ex. C ("Law Library Schedule") at 1).

In February 2025, Plaintiff received two disciplinary reports from Lt. Connell regarding an incident that occurred on February 3, 2025.  (Am. Compl. at 42).  Specifically, Officer Howard

8

charged Plaintiff with conduct which disrupts or interferes with the security or orderly running of the correctional facility by encouraging and influencing another inmate to spit on Sgt. Maenar. (Am. Compl., Ex. E ("Disruptive Conduct Disciplinary Report" or "Disruptive Conduct Disciplinary Rep.")) at 1). Officer Howard also charged Plaintiff with refusing to obey an order given by a staff member because Plaintiff "was yelling and encouraging Inmate Mitchell to get irate causing him to spit on Sergeant Maenar." (Am. Compl., Ex. E ("Refusal to Obey Order Disciplinary Report" or "Refusal to Obey Order Disciplinary Rep.") at 1). Both reports indicated that they were authorized by Lt. Connell, delivered to Plaintiff by Sgt. Ali at 6:30 a.m. on February 3, 2025, and Plaintiff "was unable to sign." (Disruptive Conduct Disciplinary Rep. at 1; Refusal to Obey Order Disciplinary Rep. at 1).

According to the Amended Complaint, "the handwriting on both of [the Disruptive Conduct Disciplinary Report and the Refusal to Obey Order Disciplinary Report] was much different from each other." (Am. Compl. at 43). Plaintiff apparently asked Officer Howard if he wrote and signed both documents, and Officer Howard responded, "[i]t look[s] like I signed one of them and the other is not my signature." (*Id.* at 94; *see also id.* at 43 ("So, I Mr. Ashley-Drake asked [] Lt. Connell did he write both of the Disciplinary Reports and signed them. Officer Howard told Mr. Ashley-Drake, 'It look[s] like I signed one of them and the other is not my signature.'")).

Plaintiff also asserts that the two reports provided deficient descriptions of the alleged infractions. According to him, the Refusal to Obey Order Disciplinary Report should have explained under the "Description of Alleged Infraction" how he refused to obey an order from any staff member (for instance, "if a staff member would have stated to me go and have a seat and I refused to have a seat then this would be refusing a direct order from a staff member"). (*Id.* at 43).

9

With respect to the Disruptive Conduct Disciplinary Report, Plaintiff claims that it should have stated how he disrupted or interfered with the security or orderly running of the correctional facility ("e.g., if I had been involved in an incident at 4:40 a.m. in the morning, then this would be conduct to disrupt"). (*Id.* at 44).

The two reports "are lies" because Plaintiff did not commit the charged offenses. (*Id.* at 45). According to Plaintiff, Mitchell fell off the top bunk and was yelling for his mother. (*Id.* at 44). Because Plaintiff has diabetes, he knew Mitchell was a diabetic and was going into diabetic shock, and he told Sgt. Maenar, "[y]ou better not spray him." (*Id.*). Sgt. Maenar ordered Plaintiff to sit on his bed, Plaintiff went back to the bed as ordered, and he was not in the dorm when Mitchell spat on Sgt. Maenar because by this point in time Plaintiff had been escorted out of the dorm in handcuffs and went to medical without incident. (*Id.* at 44–46).

Plaintiff further alleges that he "was never served the Disciplinary Reports because if you would look at Inmate's Signature on both of the Disciplinary Reports it states, 'Unable to sign.'" (*Id.* at 45). Alleging that he was not in the infirmary, he rhetorically asks "[h]ow is it possible that [Plaintiff was] unable to sign the Disciplinary Reports when he was housed in 2E-2." (*Id.*). "On February 3, 2025, [Plaintiff] was sent to Restorative Justice Unit [("RHU")] where he was not served a charge. . . . Mr. Ashley-Drake could have signed the Disciplinary Report[s] because he was not in the infirmary or at an outside hospital." (*Id.* at 50). Accordingly, Plaintiff's due process rights were violated because he "did not have an opportunity to be served a disciplinary charge within 24 hours to prepare a defense." (*Id.* at 45 (citing N.J. Admin. Code § 10A:4-9.2)). Because

he could not go to the law library while serving his detention, Plaintiff went on a hunger strike on February 3, 2025.  (*Id.* at 107).

On February 5, 2025, Zydzik conducted a hearing on the February 3, 2025 disciplinary charges.  Upon Plaintiff entering the hearing room, Zydzik told Officer Mosquera to remove his handcuffs and for Plaintiff to be seated.  (*Id.* at 101–02).  Plaintiff then said to Zydzik, "I hope that you listen to me this time instead of giving me a sanction."  (*Id.* at 102).  Zydzik told Officer Mosquera, "Get him the fuck out of here!"  (*Id.*).  The officer pulled Plaintiff away, and Plaintiff told Zydzik to have a good day.  (*Id.*).  "Mr. Zydzik then stated to me, 'Go fuck yourself!' Mr. Ashley-Drake, then stated to Mr. Zydzik, 'Go and fuck your mother!' Then, Officer Mosquera and Mr. Ashley-Drake left . . . the Disciplinary Hearing without incident."  (*Id.*).

Zydzik imposed a sanction of six (6) days' detention and thirty (30) days' loss of tablet privileges.  (*Id.* at 103–04).  While he was serving his detention, Plaintiff was permitted to go to the law library on only two days for less than two hours each day.  (*Id.* at 50).  Because he could not go to the law library, he went on suicide watch and a hunger strike.  (*Id.*).  "By failing to correct what he knows [] is wrong on the face [of] the Disciplinary Report[s] and not correcting the issue at hand," Zydzik alleged violated Plaintiff's constitutional rights, Inmate's Rights and Responsibilities, and the Court Order.  (*Id.* at 103).  Likewise, Zydzik failed to stipulate or ask the ECCF administration if Plaintiff had any court orders, or to specify in the sanction that Plaintiff would be allowed to go to the law library while Plaintiff was serving his detention time.  (*Id.*).  As a result of Zydzik's failures, Plaintiff was prejudiced and unable to prepare a defense in his criminal case while being held in detention, "being that he lost a lot of time due to the hindering of him being unable to get [to] the law library."  (*Id.*).  Similarly, Lt. Connell knew about the Court Order, failed to tell the staff members about it, and failed to make sure that Plaintiff would receive

11

his allotted time in the law library while serving his detention sanction (which resulted in Plaintiff losing "a lot of time at the [ECCF's] law library"). (*Id.* at 37).

According to Plaintiff, "Ms. Coley went beyond her duties as the secretary at the [ECCF] to try to get in contact with [Judge] Caulfield by calling the Courthouse, but Kathy Coley left a message on voicemail and Judge Caulfield stated on the Record [at Plaintiff's April 10, 2025 court appearance] that she tried to call Kathy Coley back, but her answering machine came on." (*Id.* at 89). At this court appearance, Plaintiff stated on the record that ECCF was violating his constitutional rights and Inmate Rights and Responsibilities. (*Id.* at 106). A social worker named Ms. Plaza called Coley's office to ask why he was not being allowed to go to the law library, but, "when Ms. Plaza would call her in front of [Plaintiff] on the unit's telephone on Dorm 1, Ms. Coley would tell Ms. Plaza that she has to get in contact with the Court." (*Id.*). Plaintiff is still waiting for Coley to reply to his requests. (*Id.*). On May 10, 2025, Judge Caulfield stated on the record that, if the ECCF was across from the courthouse, she would walk over to the jail and "see what's the problem concerning the Court Order." (*Id.* at 90).

In the conclusion to his Amended Complaint, Plaintiff indicates that the Defendants intentionally violated the Court Order; displayed negligence causing him to lose "a considerable and massive amount of time to prepare a defense in [his] criminal case . . . being that he had a Court Order for Extended Law Library Time, but he was unable to go into the law library at [ECCF] for the extra time by the above defendants;" and there were unreasonable delays interfering with his attempts to prepare a defense in his criminal case due to an inability to review "the voluminous discovery he never seen fully;" ECCF was an essential part of a "well-oiled criminal machine, run by the corrupt purportedly 'elected' officials and/or staff members;" the unconstitutional "secrecy" with no accountability or transparency has hurt him; and the ECCF staff

12

members knew or reasonably should have known that the action they took within their sphere violated his constitutional rights and Inmate Rights and Responsibilities. (*Id.* at 104, 107). Defendants (the "alleged contemnor[s]") knowingly and willfully disobeyed the Court Order by "having the staff members" obey the "frivolous & malicious invalid [Marrow] Memorandum" and thereby should be held in criminal contempt. (*Id.* at 104–06).

Plaintiff also identifies "some of the excuses that hinder Mr. Ashley-Drake from going into the library by the staff member(s) at [ECCF].":

1. The [Marrow] Memorandum states, ". . . he [Mr. Ashley-Drake] is to be allowed extended law library access from October 16, 2024 to November 21, 2024 . . ." [although the Court Order specifically states "until the disposition of his pending criminal case"]; or

2. The [Marrow] Memorandum states ". . . Ashley-Drake . . . has been approved for extended law library time of three (3) hours, three (3) times per week . . ." plus a main law library that inmates can go to; or

3. You cannot go to the law library because another inmate is using the law library (Keep in mind: That the facility has over ten (10) law libraries that an inmate can use); or

4. It [is] not your day to go to the law library; or

5. Sgt. Bogan stated to Mr. Ashley-Drake that the Court Order that [Judge] Caulfield sent to [ECCF] was not official (he stated this to Mr. Ashley-Drake in front of his face while Officer Whaler (who was the 5 day officer on 2D-1) was standing there as well as other inmates); or

6. You can't go to the law library today it CLOSED; or

7. Some of the officers would state to Mr. Ashley-Drake, "Hold on, I will come and take you, so that you could go to law library." Mr. Ashley-Drake would be waiting for one of the officers to

13

come to take him to the law library or the officer(s) will never come to get him; or

8. The officers would prematurely tell Mr. Ashley-Drake that his time is up in the law library. They would come and get him from the law library within the one (1) hour time.

(*Id.* at 105).

Plaintiff asks the Court for the following relief:

1. Plaintiff asks this Court to require [ECCF] staff member(s) to adhere to any Court Orders that comes from the Courts and/or any Judge; or

2. Not to violate any inmate's Constitutional Rights, Inmate's Rights & Responsibilities; or

3. To have the staff members at [ECCF] to follow their Rules, Regulations and/or Procedures; or

4. By the staff members not honoring [Judge] Caulfield's Court Order that was implemented, this had a seriously injuriously [e]ffect[ on] Mr. Ashley-Drake by [] hindering him to prepare a defense in his criminal case, by staff members [at] the [ECCF] caused him personal injury.

(*Id.* at 108). Plaintiff "sues each of the defendant[s] in both their individual and official capacities and seeks damages $1,000,000.00 in compensatory damages for pain, suffering, day to day difficulties and mental trauma and $500,000.00 in punitive damages from each defendant." (*Id.* (footnote omitted)).

On or about May 5, 2025, Plaintiff submitted a filing docketed as "Petition/TRO," and, on May 14, 2025, a Clerk's Letter was entered noting that this filing was not accompanied by the filing fee or an application to proceed IFP.[2] (D.E. Nos. 1 & 2). A complaint and IFP application were received on May 15, 2025. (D.E. No. 5). On May 16, 2025, the Court denied the TRO

---

[2] *See Burns v. Morton*, 134 F.3d 109, 113 (3d Cir. 1998) (holding that a *pro se* prisoner's habeas petition is deemed filed at the moment he delivers it to prison officials for mailing to the district court).

14

request *without prejudice*, administratively terminated this matter without filing the complaint or assessing a filing fee, and stated that Plaintiff may reopen this matter by submitting a completed signed IFP application, including a certified six-month prison account statement, or payment of the filing and administrative fee.  (D.E. No. 4).  On July 14, 2025, Plaintiff's Amended Complaint was docketed, and, on July 15, 2025, the Court reopened this matter, granted IFP, ordered the Amended Complaint to be filed, and ordered that summonses shall not issue at this time because the Court had not yet completed its *sua sponte* screening.  (July 15, 2025 Order at 3).  Plaintiff has filed the following motions or requests: (i) Request for TRO (D.E. No. 7); (ii) the First Grievance Form Request (D.E. No. 8); (iii) the Criminal Complaint Request (D.E. No. 9); (iv) the First Motion for TRO (D.E. No. 13); (v) the Second Grievance Form Request (D.E. No. 13); (vi) the Second Motion for TRO (D.E. No. 14); (vii) the Production Request (D.E. No. 14); (viii) the Mental Health Document Request (D.E. No. 15); and (ix) the Third Grievance Form Request (D.E. No. 15-1).

## II.    STANDARDS OF REVIEW

Pursuant to 28 U.S.C. § 1915(a), the District Court may authorize a plaintiff to proceed IFP and order a complaint to be filed without requiring the prepayment of filing fees.  The statute "is designed to ensure that indigent litigants have meaningful access to the federal courts."  *Deutsch v. United States*, 67 F.3d 1080, 1084 (3d Cir. 1995) (quoting *Neitzke v. Williams*, 490 U.S. 319, 324 (1989)).  However, to guard against potential "abuse" of "cost-free access to the federal courts," *id.* (citing *Denton v. Hernandez*, 504 U.S. 25, 29 (1992)), § 1915(e) empowers the District Court to dismiss an *in forma pauperis* complaint if it "is frivolous or malicious" or "fails to state a claim on which relief may be granted."  28 U.S.C. § 1915(e).

Thus, the Court must conduct a two-step analysis when considering a complaint filed with an *in forma pauperis* application: "First, the Court determines whether the plaintiff is eligible to proceed under 28 U.S.C. § 1915(a) . . . . Second, the Court determines whether the Complaint should be dismissed as frivolous or for failure to state a claim upon which relief may be granted, as required by 28 U.S.C. § 1915(e)." *Archie v. Mercer Cnty. Courthouse*, No. 23-3553, 2023 WL 5207833, at *2 (D.N.J. Aug. 14, 2023) (citing *Roman v. Jeffes*, 904 F.2d 192, 194 n.1 (3d Cir. 1990)).

Under the first step, § 1915(a) requires Plaintiff to submit "an affidavit stating all income and assets, the plaintiff's inability to pay the filing fee, the 'nature of the action,' and the 'belief that the [plaintiff] is entitled to redress.'" *Martinez v. Harrison*, No. 23-3513, 2023 WL 5237130, at *1 (D.N.J. Aug. 15, 2023) (alteration in original) (quoting 28 U.S.C. § 1915(a)). Prisoners are additionally required to submit "a certified copy of [a] trust fund account statement . . . for the 6-month period immediately preceding the filing of the complaint." 28 U.S.C. § 1915(a)(2).

Second, district courts must review complaints in civil actions in which a convicted prisoner or pretrial detainee is proceeding IFP, *see* 28 U.S.C. § 1915(e)(2)(B), seeks redress against a governmental employee or entity, *see id.* § 1915A(a), or brings an action with respect to prison conditions, *see* 42 U.S.C. § 1997e(c). District courts may sua sponte dismiss any claim that is frivolous, malicious, fails to state a claim upon which the court may grant relief, or seeks monetary relief from a defendant who is immune from such relief. *See* 28 U.S.C. §§ 1915(e)(2)(B), 1915A(b); 42 U.S.C. § 1997e(c)(1).

The legal standard for dismissing a complaint for failure to state a claim pursuant to §§ 1915(e)(2)(B), 1915A(a), or 1997e(c)(1) is the same as that for dismissing a complaint pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. *See Schreane v. Seana*, 506 F. App'x

16

120, 122 (3d Cir. 2012); *Courteau v. United States*, 287 F. App'x 159, 162 (3d Cir. 2008); *Mitchell v. Dodrill*, 696 F. Supp. 2d 454, 471 (M.D. Pa. 2010).  A court properly grants a motion to dismiss under Rule 12(b)(6) "if, accepting all well pleaded allegations in the complaint as true, and viewing them in the light most favorable to plaintiff, plaintiff is not entitled to relief."  *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1420 (3d Cir. 1997) (citing *Bartholomew v. Fischl*, 782 F.2d 1148, 1152 (3rd Cir. 1986)).

To survive *sua sponte* screening for failure to state a claim, the complaint must allege "'sufficient factual matter' to show that the claim is facially plausible."  *See Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009) (citing *Ashcroft v. Iqbal*, 566 U.S. 662, 678 (2009)).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the [alleged] misconduct."  *Iqbal*, 556 U.S. at 678 (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007)).  Under Federal Rule of Civil Procedure 8, a complaint's claims must be supported by "a short and plain statement . . . showing that the pleader is entitled to relief" and "a demand for the relief sought, which may include relief in the alternative or different types of relief."  Fed. R. Civ. P. 8(a)(2)–(3).  "Each allegation must be simple, concise, and direct."  Fed. R. Civ. P. 8(d)(1).  The complaint must set forth the plaintiff's claims with enough specificity to "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests."  *Twombly*, 550 U.S. at 555 (citations omitted); *see also Dist. Council 47 v. Bradley*, 795 F.2d 310, 315 (3d Cir. 1986) (stating that the complaint must contain sufficient facts to put the defendants on notice permitting them to frame an answer to the plaintiff's allegations).  A complaint that "offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do,'" and a complaint will not "suffice" if it provides only "'naked assertion[s]' devoid of 'further factual enhancement.'"  *Iqbal*, 556 U.S. at

17

678 (quoting *Twombly*, 550 U.S. at 555, 557).  While courts liberally construe *pro se* pleadings, *pro se* litigants still are required to allege sufficient facts to support a claim and to comply with the pleading requirements of Rule 8.  *See Mala v. Crown Bay Marina, Inc.*, 704 F.3d 239, 245 (3d Cir. 2013); *Thakar v. Tan*, 372 F. App'x 325, 328 (3d Cir. 2010).

The Court has already granted Plaintiff leave to proceed IFP.  (*See* July 15, 2025 Order at 3).  It now screens the Amended Complaint under the second step of the screening process.

"[The Court's] preliminary review under 28 U.S.C. § 1915 does not determine whether the allegations in the [Amended] Complaint would survive a properly supported motion to dismiss filed by a defendant after service."  *Stahler v. Kelly*, No. 25-15183, 2026 WL 4735379, at *2 n.1 (citing *Richardson v. Cascade Skating Rink*, No. 19-8935, 2020 WL 7383188, at *2 (D.N.J. Dec. 16, 2020).

Furthermore, Plaintiff moves for injunctive relief.  Federal Rule of Civil Procedure 65 governs the issuance of temporary restraining orders ("TROs") and preliminary injunctions.  Courts apply a four-factor test when considering whether to grant injunctive relief under Rule 65.  *See Hope v. Warden York Cnty. Prison*, 972 F.3d 310, 319–20 (3d Cir. 2020).  Specifically, a movant must demonstrate:

> (1) that they are reasonably likely to prevail eventually in the litigation and (2) that they are likely to suffer irreparable injury without relief.  If these two threshold showings are made the District Court then considers, to the extent relevant, (3) whether an injunction would harm the [defendants] more than denying relief would harm the plaintiffs and (4) whether granting relief would serve the public interest.

*Id.* (alteration in original) (quoting *K.A. ex rel. Ayers v. Pocono Mountain Sch. Dist.*, 710 F.3d 99, 105 (3d Cir. 2013)).  "A party seeking a mandatory preliminary injunction that will alter the status quo bears a particularly heavy burden in demonstrating its necessity."  *Acierno v. New Castle Cnty.*, 40 F.3d 645, 653 (3d Cir. 1994) (citing *Punnett v. Carter*, 621 F.2d 578, 582 (3d Cir. 1980)).

18

This heavy burden requires the party "to show a substantial likelihood of success on the merits and that [his] 'right to relief [is] undisputably clear.'" *Hope*, 972 F.3d at 320 (alteration in original) (quoting *Trinity Indus., Inc. v. Chi. Bridge & Iron Co.*, 735 F.3d 131, 139 (3d Cir. 2013)).

Under Rule 65(b), however, a court may issue a TRO without notice to the adverse party only if the moving party provides "specific facts in an affidavit or a verified complaint clearly show[ing] that immediate and irreparable injury, loss, or damage will result to the movant before the adverse party can be heard in opposition" and "the movant's attorney certifies in writing any efforts made to give notice and the reasons why notice should not be required." Fed. R. Civ. P. 65(b)(1)(A)–(B). Granting a TRO without notice is the rare exception. "As the Supreme Court has observed, 'our entire jurisprudence runs counter to the notion of court action taken before reasonable notice and an opportunity to be heard has been granted [to] both sides of a dispute.'" *Hope*, 972 F.3d at 320 (quoting *Hope v. Warden York Cnty. Prison*, 956 F.3d 156, 160 (3d Cir. 2020)).

## III.    DISCUSSION

Plaintiff brings this action pursuant to 42 U.S.C. § 1983 ("Section 1983"). (*See* Am. Compl. at 4). To state a claim for relief under 1983, a plaintiff must allege: (i) that the conduct complained of was committed by a person acting under color of state law; and (ii) the conduct deprived the plaintiff of a federally secured right. *See Moore v. Tartler*, 986 F.2d 682, 685 (3d Cir. 1993). He also alleges violations of "Inmate's Rights & Responsibilities" (Am. Compl. at 5), which the Court construes as alleging claims under New Jersey Administrative Code § 10A:4-3.1, entitled "Notification of inmates of their rights and responsibilities."

19

### A.    Plaintiff's State Law Claims

Plaintiff claims that the named Defendants violated his "Inmate's Rights & Responsibilities." (*See* Am. Compl. at 6). Section 10A:4-3.1 of New Jersey's Administrative Code does not explicitly create a private cause of action, and, in such circumstances, New Jersey courts are reluctant to infer such a right. *See Ashley v. Metelow*, No. 15-3153, 2018 WL 4462413, at *4 (D.N.J. Sept. 18, 2018). Factors used to decide whether a statute creates an implied private right of action include whether the plaintiff is a member of the class for whose special benefit the provision was enacted, whether there is any evidence that the New Jersey Legislature intended to create a private right of action, and whether such a right of action is consistent with the underlying purposes of the scheme. *See id.* (stating that the primary goal is to uncover the underlying legislative intent).

"Plaintiff is clearly among the class of persons meant to benefit from these provisions, but '[t]here is no support that the Legislature intended these provisions to provide a basis for a civil suit for damages, or authorized the Commissioner of the Department of Corrections to create a basis for state civil liability in the administrative code.'" *Id.* (quoting *Turner v. Johnson*, No. 17-0541, 2018 WL 2859678, at *6 (D.N.J. June 11, 2018)); *see also Drury v. Debellis*, No. 15-2137, 2017 WL 2968393, at *6–7 (D.N.J. July 12, 2017) (dismissing § 10A:4-3.1 claim *with prejudice*). Accordingly, Plaintiff's "Inmate's Rights & Responsibilities" claims are **DISMISSED** *with prejudice* for failure to state a claim.

### B.    Plaintiff's Federal Claims

For purposes of screening, the Court construes the Amended Complaint as asserting the following claims for prospective and monetary relief under Section 1983 against some or all Defendants for: (i) violations of Plaintiff's constitutional rights of access to the courts and to

counsel in the pending criminal case against him; (ii) deprivation of his due process rights; (iii) unconstitutional retaliation; and (iv) the unconstitutional use of excessive force.  Plaintiff names Defendants in both their official and individual capacities. (Am. Compl. at 108).  The Court further construes the Amended Complaint as asserting official-capacity claims for damages and injunctive relief and individual-capacity claims for damages.

### 1.      Official Capacity Claims

Plaintiff acknowledges that "[c]laims against individuals in their official capacities are equivalent to claims against the entity for which they work."  (Am. Compl. at 108 n.80); *see also* *Watson v. Mercer Cnty.*, No. 25-23318, 2026 WL 562790, at *15 n.3 (D.N.J. Feb. 27, 2026) ("However, 'a lawsuit against public officers in their official capacities is functionally a suit against the public entity that employs them.'" (quoting *Cuvo v. De Biasi*, 169 F. App'x 688, 693 (3d Cir. 2006))).  Accordingly, Plaintiff's official-capacity claims under Section 1983 against the named Defendants are **DISMISSED** *with prejudice* for failure to state a claim.  However, the Court additionally construes the Amended Complaint as raising municipal liability claims for damages and injunctive relief against the County of Essex ("Essex County"), the municipal entity that employs the named Defendants.

To state a plausible claim under *Monell* for relief against a municipality "a plaintiff must plead facts showing that the municipal defendant caused the underlying constitutional violation through its issuance or adoption of a policy, practice or custom."[3] *Echevarria v. Essex Cnty. Dep't of Corr.*, No. 20-0498, 2020 WL 1243810, at *2 (D.N.J. Mar. 16, 2020) (citing *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690 n.55 (1978)).  The municipal policy, practice, or custom must

---

[3]      "The policy or custom pleading requirement applies regardless of the relief sought, i.e., whether the plaintiff seeks damages or prospective relief such as injunctive relief or declaratory relief." *Hill v. Chester Cnty.*, No. 25-5019, 2026 WL 368543, at *3 (E.D. Pa. Feb. 9, 2026) (citing *Los Angeles Cnty. v. Humphries*, 562 U.S. 29, 31 (2010)).

21

constitute the "moving force" behind the alleged violation. *See id.* (citing *City of Canton v. Harris*, 489 U.S. 378, 379 (1989)). A plaintiff must identify the challenged policy or custom, attribute it to the municipality itself, and show a causal link between execution of the policy and the injury suffered. *See Harley v. City of N.J. City*, No. 16-5135, 2017 WL 2779466, at *7–8 (D.N.J. June 27, 2017). A policy is made when an official possessing final policymaking authority issues a proclamation, policy, or edict. *See Fong v. City of Newark*, No. 22-7243, 2024 WL 5074763, at *3 (D.N.J. Oct. 12, 2024). "At the pleading stage, 'a plaintiff must show that an official who has the power to make policy is responsible for the action'" and, in "deciding who has policymaking responsibility, a court must determine which official has final, unreviewable discretion to make a decision or take an action, a question that is answered by looking to state law." *Fisher v. Cnty. of Mercer*, No. 23-20947, 2024 WL 3594423, at *5 (D.N.J. Jul. 31, 2024) (citations omitted). Custom 'can be proven by showing that a given course of conduct, although not specifically endorsed or authorized by law, is so well-settled and permanent as virtually to constitute law.'" *Fong*, 2024 WL 5074763, at *3 (quoting *Bielevicz v. Dubinon*, 915 F.2d 845, 850 (3d Cir. 1990)).

Furthermore, a municipality's failures to act, including failures to train, supervise, or discipline its employees and officers, can result in an actionable violation under Section 1983. *See Reitz v. Cnty. of Bucks*, 125 F.3d 139, 145 (3d Cir. 1997). Generally, plaintiffs demonstrate deliberate indifference for "failure to" or inadequacy claims by showing of a pattern of similar constitutional violations. *See Thomas v. Cumberland Cnty.*, 749 F.3d 217, 223 (3d Cir. 2014).

Plaintiff admits that his official-capacity claims "require proof that a policy or custom of the entity violated the plaintiff's rights." (Am. Compl. at 108 n.80). However, Plaintiff fails to plead facts plausibly identifying the challenged policy or custom, attributing it to Essex County, or show a causal link between execution of the policy and the injury suffered. *See Harley*, 2017

22

WL 2779466, at *7–8. He also does not allege facts plausibly indicating that the municipality is liable under a "failure to act" or inadequacy theory of liability. While Plaintiff refers, *inter alia*, to the Marrow Memorandum, the Law Library Schedule, and disciplinary proceedings (*see* Am. Compl. at 19, 36–37, 52–53), there is no indication that the respective officials who were responsible for (or knew of) such actions possessed final discretion to make a binding decision on behalf of Essex County. *See Fong*, 2024 WL 5074763, at *3; *Fisher*, 2024 WL 3594423, at *5. Finally, Plaintiff does not plausibly allege a "given course of conduct" "so well-settled and permanent as virtually to constitute law.'" *Fong*, 2024 WL 5074763, at *3 (citation omitted).

Accordingly, the Court **DISMISSES** *without prejudice* Plaintiff's *Monell* claims against Essex County for failure to state a claim.

### 2. Individual-Capacity Claims

#### a. Access to the Courts

Prisoners maintain a "fundamental constitutional right of access to the courts," embodied in the First and Fourteenth Amendments. *Lewis v. Casey*, 518 U.S. 343, 346 (1996) (quoting *Bounds v. Smith*, 430 U.S. 817, 828 (1977)). The Third Circuit has held that pretrial detainees have a right of access to the courts with respect to legal assistance and participation in preparing a defense against pending criminal charges. *See Prater v. City of Philadelphia*, 542 F. App'x 135, 137–38 (3d Cir. 2013); *see also May v. Sheahan*, 226 F.3d 876, 883–84 (7th Cir. 2000). A pretrial detainee may also raise claims alleging interference with his Sixth Amendment rights. *See Prater*, 542 F. App'x at 137. In contrast, convicted prisoners may only proceed on access-to-the-courts claims in two situations: "challenges (direct or collateral) to their sentences and conditions of

confinement." *Id.* at 138 (citing *Lewis*, 518 U.S. at 354–55). Because Plaintiff was a pretrial detainee, this restriction does not apply to him.

There are two general types of access-to-the-courts claims. Forward-looking claims involve official action that "frustrates a plaintiff . . . in preparing and filing suits at the present time." *Christopher v. Harbury*, 536 U.S. 403, 413 (2002). In such a claim, "[t]he opportunity has not been lost for all time, however, but only in the short term; the object of the denial-of-access suit, and the justification for recognizing that claim, is to place the plaintiff in a position to pursue a separate claim for relief once the frustrating condition has been removed." *Id.* In backward-looking claims, the official acts "allegedly have caused the loss or inadequate settlement of a meritorious case" or the loss of a particular type of relief. *Id.* at 414 (citation omitted).

In both forward-looking and backward-looking types of cases, however, the plaintiff must identify a "nonfrivolous" or "arguable" underlying claim. *Christopher*, 536 U.S. at 415 (citing *Lewis*, 518 U.S. at 353 & n.3). Indeed, "the underlying cause of action, whether anticipated or lost, is an element that must be described in the complaint, just as much as allegations must describe the official acts frustrating the litigation." *Id.* This is so because "a prisoner making an access-to-the-courts claim is required to show that the denial of access caused actual injury." *Jackson v. Whalen*, 568 F. App'x 85, 87 (3d Cir. 2014) (per curiam) (quoting *Lewis*, 518 U.S. at 350). That is, a prisoner claiming that he was denied access to the courts must allege an injury traceable to the conditions of which he complains. *See Diaz v. Holder*, 532 F. App'x 61, 63 (3d Cir. 2013) (per curiam) (affirming dismissal of denial of access claims where plaintiff failed to tie alleged deficiencies in library access to harm in underlying action). As explained by the Supreme Court, "because *Bounds* did not create an abstract, freestanding right to a law library or legal assistance, an inmate cannot establish relevant actual injury simply by establishing that his prison's

24

law library or legal assistance program is subpar in some theoretical sense." *Lewis*, 518 U.S. at 351.

Plaintiff fails to satisfy this "actual injury" requirement.  Instead, Plaintiff makes numerous conclusory allegations regarding the purported effects of Defendants' actions (or inactions) on the criminal case against him.  For example, he repeatedly indicates that the Marrow Memorandum (providing for extended law library access "three (3) hours, three (3) times per week" (Marrow Mem. at 1)) violated the Court Order (indicating that he should receive three hours of law library access every day of the week) and, as a result: (i) "Mr. Ashley-Drake was unable to prepare a defense for his case"; (ii) "Mr. Ashley-Drake [was] unable to be tried only up the charges found by a grand jury being that the [Marrow] Memorandum was sent out to the staff members [at ECCF] and Mr. Ashley-Drake was unable to prepare a defense for his criminal case"; (iii) "Mr. Ashley Drake did not have the right to participate in the use of law library reference materials to assist him in resolving his legal problems"; (iv) "Mr. Ashley-Drake did not have the right to review the voluminous discovery as the Court Order sated [sic] to prepare for his defense"; and (v) "Mr. Ashley-Drake was prejudiced and was unable to prepare a defense for his case, being that he lost a lot of time at the [ECCF's] law library due to him being unable to go the law library [every day, seven days a week, for at least three hours per day, until the disposition of his pending criminal case]."  (*See* Am. Compl. at 20–22, 24–26).  Similarly, Plaintiff claims that, because of the disciplinary proceedings against him (resulting in detention and loss of tablet privileges), he was unable to use LexisNexis, and "he lost a lot of time" in the law library, which prejudiced him and prevented him from preparing his defense.  (*See id.* at 32–33, 100–01, 103).  According to the concluding section of the Amended Complaint, Defendants' "intentional violations" and "negligence" caused Plaintiff "to lose a considerable and massive amount of time to prepare a

defense in [his] criminal case [and] his upcoming Court proceedings, being that he had a Court Order for Extended Law Library Time, but he was unable to go into the law library [ECCF] for the extra time by the above defendants," and that there were "unreasonable delays which interfere[] with Mr. Ashley-Drake trying to prepare a defense in his upcoming criminal case, in which he was unavailable to review the voluminous discovery that he never seen fully." (*Id.* at 104).

However, it is well established that a complaint that "offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do,'" and a complaint will not "suffice" if it provides only "'naked assertion[s]' devoid of 'further factual enhancement.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 555, 557). Plaintiff does not provide "further factual enhancement" in support of his conclusory allegations regarding the alleged effects of the Marrow Memorandum and other alleged actions by Defendants on his ability to defend against his criminal case. Specifically, he fails to identify a "nonfrivolous" or "arguable" underlying claim or issue that he has (or could) lose in the criminal case against him. *Christopher*, 536 U.S. at 415 (citing *Lewis*, 518 U.S. at 353 & n.3). For instance, he repeatedly asserts that he was unable to review the voluminous discovery produced in his criminal case in its entirety; but he does not allege any facts indicating that this inability has resulted in his failure to raise an arguable motion or defense to the criminal charges against him.

Accordingly, the Court **DISMISSES** *without prejudice* Plaintiff's individual-capacity access-to-the-courts claim for damages against Defendants for failure to state a claim.

### b.      Interference with Counsel

"Under the Sixth Amendment, a pretrial detainee has a right to utilize counsel to defend against a criminal case that the state has brought against him." *Prater v. City of Philadelphia*, No. 11-1618, 2015 WL 3456659, at *4 (E.D. Pa. June 1, 2015) (citing *Benjamin v. Fraser*, 264 F.3d

26

175, 186 (2d Cir. 2001)).  Addressing restrictions on attorney contact, the Supreme Court has held that inmates must have a reasonable opportunity to seek and receive the assistance of attorneys and that prison regulations and rules unjustifiably obstructing the availability of professional representation are invalid.  *Id.* (citing *Benjamin*, 264 F.3d at 184).  "Thus, where an institutional restriction impedes a pretrial detainee's access to criminal counsel, 'the practice must be evaluated in the light of the central objective of prison administration, safeguarding institutional security.'" *Id.* (quoting *Benjamin*, 264 F.3d at 187).  A prison regulation restricting a pretrial detainee's contact with counsel will be unconstitutional where it unreasonably burdens the inmate's opportunity to consult with his counsel and prepare his defense.  *See id.*

Notably, unlike an access-to-the-courts claim, case law indicates that a claim of unreasonable interference with the Sixth Amendment right to counsel does not require a showing of actual injury.  *See Benjamin*, 264 F.3d at 185 (pretrial detainee has standing to assert unreasonable interference with the Sixth Amendment right even if the interference did not result in "actual injury").  Although the Third Circuit has not ruled on this issue in a published opinion, it observed in a non-precedential opinion that the district court failed to address the prisoner's Sixth Amendment interference with right to counsel claim and disagreed with the district court's implicit conclusion that the claim required a showing of actual injury.  *Prater*, 542 F. App'x at 139 n.5 (affirming in part on alternate basis).

The Court concludes that Plaintiff's Sixth Amendment individual-capacity claim against Defendants survives screening.  Specifically, the Court Order stated that, "[Plaintiff] having the right to review the voluminous discovery in this matter, and to prepare for his upcoming motions," and accordingly "ORDERED that defendant be permitted to use the law library at the Essex County Correctional Facility every day, seven days a week, for at least three hours per day, until

27

the disposition of his pending criminal case." (Ct. Order at 1).  However, based on the Marrow

Memorandum (typed by Coley and signed by Marrow, and sent to Charles, Captains, Lieutenants,

and Sergeants) and the Law Library Schedule (signed by Sgt. Bogan), Plaintiff was allegedly

provided with law library access "three (3) hours, *three days* per week."  (*See* Marrow Mem. at 1

(emphasis added); *see also* Law Library Schedule at 1).  On May 10, 2025, Judge Caulfield stated

on the record that, if the ECCF was across the street from the courthouse, she would walk over to

the facility and "see what's the problem concerning the Court Order."  (Am. Compl. at 90; *see also*

*id.* at 89 (further alleging that Judge Caulfield tried to return Coley's call)).  Liberally construing

the *pro se* Amended Complaint in Plaintiff's favor, accepting the factual allegations as true, and

viewing the allegations in the light most favorable to Plaintiff, Plaintiff has sufficiently alleged,

for screening purposes, that Defendants unreasonably burdened Plaintiff's Sixth Amendment right

to prepare a defense with his counsel.  Accordingly, the Court proceeds with Plaintiff's individual-

capacity claim for damages against Defendants for unreasonably interfering with his Sixth

Amendment right to counsel.

### c.    Due Process

"Generally, prisons may sanction a pretrial detainee for misconduct that he commits while

awaiting trial, as long as it is not a punishment for the 'underlying crime of which he stands

accused.'"  *Kanu v. Lindsey*, 739 F. App'x 111, 116 (3d Cir. 2018) (quoting *Rapier v. Harris*, 172

F.3d 999, 1003–06 (7th Cir. 1999)).  Pretrial detainees have "the right to receive written notice of

the charges at least 24 hours before the hearing, the opportunity to present witnesses and

documentary evidence, and a written statement of the reasons for the disciplinary action taken and

the supporting evidence."  *Id.* (citing *Wolff v. McDonnell*, 418 U.S. 539, 563–66 (1974)).

Detainees may be placed in prehearing disciplinary lockup so long as they are "afforded a hearing within a reasonable time after placement." *Layton v. Beyer*, 953 F.2d 839, 850 (3d Cir. 1992).

For screening purposes, Plaintiff adequately alleges a due process claim against the Defendants involved in his February 2025 disciplinary proceeding (Lt. Connell, Sgt. Ali, Officer Howard, and Zydzik). Specifically, Plaintiff claims that he "was never served the Disciplinary Reports because if you would look at Inmate's Signature on both of the Disciplinary Reports it states, 'Unable to sign.'" (Am. Compl. at 45 ("How is it possible that [Plaintiff] is unable to sign the Disciplinary Reports when he was housed 2E-2. [Plaintiff] was not in the infirmary."); *see also id.* at 50 ("On February 3, 2025, [Plaintiff] was sent to Restorative Justice Unit where he was not served a charge, however.")). According to the Amended Complaint, Plaintiff's due process rights were violated because he "did not have an opportunity to be served a disciplinary charge within 24 hours to prepare a defense." (*Id.* at 45 (citing N.J. Admin. Code § 10A:4-9.2)). Because it is well established that pretrial detainees like Plaintiff have a due process right to receive written notice of the charges at least 24 hours before the hearing, the Court proceeds with the individual-capacity due process claim for damages against Lt. Connell, Sgt. Ali, Officer Howard, and Zydzik.

### e.    Retaliation

Liberally construed, the Amended Complaint additionally raises a claim for retaliation against Sgt. Bogan, Officer Otera, and Officer Waters. "In order to plead a retaliation claim under the First Amendment, a plaintiff must allege: (1) constitutionally protected conduct, (2) retaliatory action sufficient to deter a person of ordinary firmness from exercising his constitutional rights, and (3) a causal link between the constitutionally protected conduct and the retaliatory action." *Thomas v. Independence Twp.*, 463 F.3d 285, 296 (3d Cir. 2006) (citing *Mitchell v. Horn*, 318 F.3d 523, 530 (3d Cir. 2003)). According to Plaintiff, on July 1, 2024, "he had a dispute with [one of

29

the officers] concerning the Law Library;" the electrical sliding door was shut on his head; and "[his] head was stuck between the electrical sliding door and the grooves on the wall for about five (5) seconds, until Officer Waters opens the electrical sliding door completely." (Am. Compl. at 84–85). A second incident involving the unit 2D-1 sliding door occurred on October 16, 2024. Sgt. Bogan called Plaintiff over to the sliding door to talk. (*Id.* at 53). Plaintiff and Sgt. Bogan had an argument about the Court Order, Sgt. Bogan ordered Officer Otera to close the door on Plaintiff's head (telling the officer "to close the fucking the electrical door on Mr. Ashley-Drake's [sic]"); Officer Otera closed the door on Plaintiff's head; Plaintiff fell to his knees, felt a "crushing sensation in his head, until Officer Otera opened the electrical sliding door," and, as a result, he suffers from constant dizziness, headaches, psychological trauma, nightmares, double vision, blurriness, ears ringing, and soreness on his head and jaw. (*Id.* at 53–54). For screening purposes, Plaintiff adequately "plead[s] a claim for retaliation" (i.e., he allegedly attempted to exercise his constitutional right to right to prepare a defense to criminal charges with his counsel, closing a sliding door on an detainee's head is evidently sufficient to deter a person of ordinary firmness from exercising his constitutional rights, and a causal link between the constitutionally protected conduct and the retaliatory action because the door was closed immediately after Plaintiff argued with an officer or Sgt. Bogan regarding law library access).

The Court proceeds the individual-capacity retaliation claim for damages against Sgt. Bogan, Officer Otera, and Officer Waters.

### f.    Excessive Force

Likewise, the Court construes the Amended Complaint as alleging an excessive force claim against Sgt. Bogan, Officer Otera, and Officer Waters arising out of the two sliding door incidents. The Due Process Clause of the Fourteenth Amendment bars state punishment of persons who are

not convicted of a crime, including pretrial detainees and individuals who are civilly committed. *See Bell v. Wolfish*, 441 U.S. 520, 535 (1979); *Hubbard v. Taylor*, 399 F.3d 150, 166 (3d Cir. 2005); *Youngberg v. Romero*, 457 U.S. 307, 315–16 (1982) (holding that the right of an involuntarily committed individual to be protected from cruel and unusual punishment and bodily restraint is guaranteed by the Fourteenth Amendment's Due Process Clause). Whether a condition of civil confinement is unconstitutional thus turns on whether it is imposed for the purpose of punishment or whether it is incidental to a legitimate government purpose. *Bell*, 441 U.S. at 534–40. "[T]he subjective Eighth Amendment standard does not apply to pretrial detainees." *Jacobs v. Cumberland Cnty.*, 8 F.4th 187, 194 (3d Cir, 2021) (citing *Kingsley v. Hendrickson*, 576 U.S. 389, 400 (2015)). Under *Kingsley*, a pretrial detainee bringing a Fourteenth Amendment excessive force claim must show that "the force purposely or knowingly used against him was objectively unreasonable." 576 U.S. at 396–97. To assess the claim, the Court considers all the circumstances including "the relationship between the need for the use of force and the amount of force used; the extent of the plaintiff's injury; any effort made by the officer to temper or to limit the amount of force; the severity of the security problem at issue; the threat reasonably perceived by the officer; and whether the plaintiff was actively resisting." *Id.* at 397.

At this early stage of the proceeding, the Amended Complaint provides sufficient facts to raise a plausible inference that objectively unreasonable force was used against him by alleging that Sgt. Bogan, Officer Otera, and Officer Waters ordered (or closed) (in Sgt. Bogan's words) the "fucking" sliding door on Plaintiff's head because of verbal disagreements regarding Plaintiff's access to the law library. The Court proceeds with Plaintiff's individual-capacity excessive force claim for damages against Sgt. Bogan, Officer Otera, and Officer Waters.

31

### C.    Plaintiff's TRO Motions and Requests for Relief

In his substantially identical First and Second Motions for TRO and his (letter) Request for TRO (D.E. Nos. 7, 14 & 15), Plaintiff asserts that he is seeking a TRO and preliminary injunction because, from on or about October 16, 2024 to the present, his Fifth and Sixth Amendment rights and "Inmates Rights and Responsibilities" were violated by the named Defendants and other staff members at the ECCF, and he requests that the Defendants and other staff members be enjoined from retaliating against him in any way because he filed this action; he is a pretrial detainee filing a *pro se* civil rights action pursuant to 42 U.S.C. § 1983 against twelve ECCF staff members and requests a TRO directing Defendants to cease and desist from denying him access to the law library pursuant to the Court Order, threatening him with false disciplinary actions to obstruct his "legal litigations," removing him from his current housing area, taking away any job he has at the ECCF, or "doing anything to Mr. Ashley-Drake while at Essex County Facility; or interfering with his access to the Courts, and/or among other actions;" it purportedly would also be retaliatory if any staff member transfers him to another correctional facility, does not answer his request and grievance forms in a timely manner, fails to hand over surveillance videos of the incidents related to the present matter or any other pending civil cases in which his lawyers unsuccessfully requested the videos, does not inform him of any medical appointments, or does "anything that would harm him in any kind of way." (Req. for TRO at 1–4; First Mot. for TRO at 1–4; Second Mot. for TRO at 1–4 (also referring to the two sliding door incidents)).  Plaintiff requests (quoted herein verbatim):

> 1) that the Essex County Correctional Facility staff needs to abide by the Court Order that the Honorable Judge Regina Caulfield's Ordered the Essex County Correctional Facility so that the plaintiff be permitted to use the law library at the E.C.C.F. every day, seven days a week, for at least three hours per day, until the disposition of his pending criminal case. 2) Not to deny the Plaintiff access to the

32

> law library pursuant to the Court Order. 2) Stop threating Mr. Ashley-Drake with false disciplinary actions to obstruct his legal litigations, and interfering with his access to the Courts, among other actions; and 3) Stop violating Mr. Ashley-Drake's Constitutional Rights and Inmate Rights & Responsibilities.

(Req. for TRO at 4; First Mot. for TRO at 3–4 (footnote omitted); Second Mot. for TRO at 3–4 (footnote omitted)).

The Request for TRO and the First and Second Motions for TRO are **DENIED** *without prejudice.* First, the Court has dismissed *without prejudice* Plaintiff's underlying claims for injunctive relief. *See supra* Section III.B.1.

Second, under Rule 65(b), a court may issue a TRO without notice to the adverse party only if the moving party provides "specific facts in an affidavit or a verified complaint clearly show[ing] that immediate and irreparable injury, loss, or damage will result to the movant before the adverse party can be heard in opposition" and "the movant's attorney certifies in writing any efforts made to give notice and the reasons why notice should not be required." Fed. R. Civ. P. 65(b)(1)(A)–(B); *see also Hope*, 972 F.3d at 320 ("As the Supreme Court has observed, 'our entire jurisprudence runs counter to the notion of court action taken before reasonable notice and an opportunity to be heard has been granted [to] both sides of a dispute.'" (quoting *Hope*, 956 F.3d at 160)). "Here, Plaintiff fails to certify in writing what efforts, if any, have been made to give notice of the motion[s] to Defendants. Having reviewed Plaintiff's filings [which allege, *inter alia*, that his constitutional rights have been violated for several months], the Court also finds that Plaintiff fails to make the specific factual showing required to establish immediate and irreparable injury, loss, or damage." *Alexander v. Russo*, No. 23-1514, 2023 WL 3434038, at *2 (D.N.J. 2023) (noting that the movant alleged conduct that began in 2000 and happened "countless times").

33

In addition, Defendants asks the Court to order the production of documents and recordings. (*See* D.E. Nos. 8, 13, 14, 15, & 15-1).  However, because no defendant has been served, the document requests are **DENIED** *without prejudice*.  In addition, he asks the Court to order the Irvington Police Department and/or the Essex County Prosecutor's Office to visit him so he could file a criminal complaint charging the alleged victim in his criminal case of committing the crime sexual extortion, N.J. Stat. Ann. § 2C:14-9.1a.  (Crim. Compl. Req. at 1).  Because the Court has no power to order local and state authorities to take steps to initiate a criminal prosecution in state courts, the request (D.E. No. 9) is **DENIED** *with prejudice.*

## IV.    CONCLUSION

For the reasons stated above, the Court **DISMISSES** *with prejudice* Plaintiff's "Inmate's Rights & Responsibilities" claims and his Section 1983 official-capacity claims against Defendants.  Construing the Amended Complaint as alleging Section 1983 claims under *Monell* against Essex County, the *Monell* claims are **DISMISSED** *without prejudice*.  The Court also **DISMISSES** *without prejudice* Plaintiff's individual-capacity Section 1983 access-to-the-courts claim for damages against Defendants.  The Court permits the following individual-capacity Section 1983 claims for damages to proceed: (i) the claim for unreasonable interference with Plaintiff's right to counsel against Defendants; (ii) the due process claim against Lt. Connell, Sgt. Ali, Officer Howard, and Zydzik; (iii) the retaliation claim against Sgt. Bogan, Officer Otera, and Officer Waters; and (iv) the excessive force claim against Sgt. Bogan, Officer Otera, and Officer Waters.  The Court **DENIES** *without prejudice* Plaintiff's Request for TRO (D.E. No. 7), First Grievance Form Request (D.E. No. 8), Second Grievance Form Request (D.E. No. 13), First Motion for TRO (D.E. No. 14), Production Request (D.E. No. 14), Second Motion for TRO (D.E.

No. 15), Mental Health Form Request (D.E. No. 15), and Third Grievance Form Request (D.E.

No. 15).  Plaintiff's Criminal Complaint Request (D.E. No. 9) is **DENIED** *with prejudice*.

An appropriate order follows.


**Dated:  March 30, 2026**

s/ *Esther Salas*
**Esther Salas, U.S.D.J.**